# Matter of Daniel Girmai NEGUSIE, Respondent

*Decided by Attorney General November 5, 2020*

U.S. Department of Justice
Office of the Attorney General

(1) The bar to eligibility for asylum and withholding of removal based on the persecution of others does not include an exception for coercion or duress.

(2) The Department of Homeland Security does not have an evidentiary burden to show that an applicant is ineligible for asylum and withholding of removal based on the persecution of others. If evidence in the record indicates the persecutor bar may apply, the applicant bears the burden of proving by a preponderance of the evidence that it does not.

## BEFORE THE ATTORNEY GENERAL

On October 18, 2018, Attorney General Sessions directed the Board of Immigration Appeals ("Board") to refer for review its June 28, 2018 decision in this matter. *Matter of Negusie*, 27 I&N Dec. 481 (A.G. 2018); *Matter of Negusie*, 27 I&N Dec. 347 (BIA 2018). To assist in this review, the order invited the parties and any interested amici to submit briefs on whether duress and coercion are relevant to the application of the so-called "persecutor bar" in the Immigration and Nationality Act, which forecloses the possibility of asylum or withholding of removal for an alien who "ordered, incited, assisted, or otherwise participated in the persecution" of any person on account of "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42), 1158(b)(2)(A)(i), 1231(b)(3)(B)(i); *see also* 8 C.F.R. § 1208.16(d)(2).

For the reasons set forth in the accompanying opinion, I vacate the Board's June 28, 2018 decision. The Board's decision did not adopt the best interpretation of the persecutor bar viewed in light of its text, context, and history, as well as of longstanding Board precedent and policies of the Department of Justice. In addition, the decision did not appropriately weigh relevant diplomatic considerations, and it introduced collateral consequences that would be detrimental to the administration of immigration law. The Board's decision also placed an initial burden on the Department of Homeland Security ("DHS") to show evidence indicating the applicant assisted or otherwise participated in persecution, which is contrary to the plain language of the governing regulations.

Because the Board incorrectly recognized a duress exception to the persecutor bar, and incorrectly placed an initial burden on DHS to show evidence the persecutor bar applies, I overrule those determinations and any other Board precedent to the extent it is inconsistent with this opinion. I vacate the Board's decision and remand this matter to the Board with instructions to place the case on hold pursuant to 8 C.F.R. § 1003.1(d)(6)(ii)(B) pending the completion or updating of all identity, law enforcement, or security investigations or examinations. Once those investigations or examinations are complete, the Board should enter an appropriate order.

The Immigration and Nationality Act ("INA") provides that an alien who has assisted or participated in acts of persecution is ineligible for asylum and other forms of protection. This "persecutor bar" excludes from asylum "any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." INA § 101(a)(42), 8 U.S.C. § 1101(a)(42); *see id.* § 208(b)(2)(A)(i), 8 U.S.C. § 1158(b)(2)(A)(i). A similar provision prevents persecutors from seeking withholding of removal under the INA, *see id.* § 241(b)(3)(B)(i), 8 U.S.C. § 1231(b)(3)(B)(i), and applies to withholding of removal under the regulations implementing the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, *opened for signature* Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 113 ("CAT"), *see* 8 C.F.R. § 1208.16(d)(2). Persecutors remain eligible for deferral of removal under the CAT. *Id.* §§ 1208.16(c)(4), 1208.17(a).

The Board of Immigration Appeals ("Board") concluded here that the persecutor bar does not apply when an alien can establish that his assistance or participation in persecution was the product of duress. Having reviewed the text, context, and history of the persecutor bar, in light of longstanding Board precedent and policies of the Department of Justice ("Department"), seeking to avoid collateral consequences that would be detrimental to the administration of immigration law, and weighing the diplomatic implications of this decision, I conclude that the best reading of the persecutor bar does not include an exception for coercion or duress. I further clarify that where the record contains evidence from which a reasonable factfinder could conclude that the persecutor bar may apply, the alien bears the burden of showing that it does not.

## I.

The respondent is a national of both Eritrea and Ethiopia. In 1995, at the age of nineteen, he was conscripted into the Eritrean military for two years. In 1998, Eritrea recalled members of the military to fight in a war with Ethiopia. The respondent reported for service, but told his commanding officer that he did not want to serve at the battlefront against Ethiopians. The respondent was subsequently assigned to surveillance and guard duty at a military base.

The Eritrean military later imprisoned the respondent and subjected him to forced labor, which he believes was a result of his refusal to serve at the battlefront. During that time he was also punished for two weeks for talking with other prisoners, being forced to roll on the ground in the hot sun for two to three hours each day and beaten with a stick when he stopped. The respondent was then released after two years and resumed his military duties, which included work as a uniformed and armed guard at the same prison where he had been detained. The respondent received what he terms "pocket money" during his service.

The respondent's duties as a prison guard included preventing prisoners from escaping, taking showers, or obtaining fresh air. He also guarded prisoners who were being punished by exposure to the hot sun, one of whom subsequently died, and he knew that his supervisor tortured prisoners with electricity. The parties do not dispute that prisoners in the Eritrean prison were being persecuted on account of protected grounds under the INA.

The respondent claims that he remained a prisoner even while working as a guard in the prison camp, that he disobeyed orders and helped other prisoners on occasion, and that his service as a guard was the result of duress and coercion. But he concedes that he assisted in the persecution of other prisoners at the prison camp. He explains that he ultimately escaped and stowed away in a cargo container, which was eventually loaded on a ship destined for the United States. After arriving in Louisiana in 2004, the respondent applied for asylum, withholding of removal, and protection under the CAT on the grounds that he would be persecuted and tortured or killed if returned to Eritrea. The Department of Homeland Security ("DHS") referred the matter to an immigration judge.

The immigration judge found that the respondent was ineligible for asylum and withholding of removal because he "assisted or participated in the persecution of others; in that, he guarded them, so that they were not able to leave the prison camp. He guarded them, so they were not able to get fresh air, and he guarded them, so they could not take showers, which assisted the government of Eritrea in its persecutory conduct." The immigration judge

explained that "there's no evidence to establish that the respondent is a malicious person or that he was an aggressive person who mistreated the prisoners," but "the very fact that he helped keep them in the prison compound where he had reason to know that they were persecuted constitutes assisting in the persecution of others and bars the respondent from relief." The immigration judge concluded, however, that it was more likely than not the respondent would be arrested and tortured if returned to Eritrea, primarily because he was a military deserter, and so the immigration judge granted his request for deferral of removal under the CAT.[1]  The respondent and DHS appealed.

The Board affirmed.  Citing precedent that traces back to *Fedorenko v. United States*, 449 U.S. 490 (1981), the Board compared the respondent's conduct to that of someone forced to serve as a guard in a Nazi concentration camp and explained that whether "the respondent was compelled to participate as a prison guard, and may not have actively tortured or mistreated anyone, is immaterial."  This is so, the Board continued, because "motivation and intent are irrelevant to the issue of whether he 'assisted' in persecution" and "the objective effect of an alien's actions . . . is controlling" (some internal quotation marks omitted).  The Board also found no error in the decision to grant deferral of removal.

On review, the U.S. Court of Appeals for the Fifth Circuit affirmed the application of the persecutor bar, holding that "[t]he question whether an alien was compelled to assist authorities is irrelevant, as is the question whether the alien shared the authorities' intentions." *Negusie v. Gonzales*, 231 F. App'x 325, 326 (5th Cir. 2007) (per curiam), *rev'd and remanded sub nom. Negusie v. Holder*, 555 U.S. 511 (2009) ("*Negusie*").  Instead, the court said that the proper "inquiry should focus on 'whether particular conduct can be considered assisting in the *persecution* of civilians.'"  231 F. App'x at 326 (quoting *Fedorenko*, 449 U.S. at 512 n.34).  Because the respondent "worked as an armed prison guard," "knew about the forms of punishment used by his superior officer," "stood guard while prisoners were kept in the sun as a form of punishment," and "acknowledged that his job description included depriving prisoners of access to showers and fresh air," the court upheld the Board's decision that respondent, as a persecutor, was barred from asylum and withholding of removal. *Id.*  DHS did not petition for review of the grant of deferral of removal.

The Supreme Court reversed and remanded.  *Negusie*, 555 U.S. at 514. Applying *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,

---

[1]  The immigration judge also observed that the respondent's claim for protection or relief implicated the possible protected grounds of religion, political opinion, and nationality.

467 U.S. 837 (1984), the Court held that the INA is silent, and therefore ambiguous, with respect to whether duress and coercion are relevant in applying the persecutor bar. *Negusie*, 555 U.S. at 518 ("On that point the statute, in its precise terms, is not explicit."). "Nor is this a case," the Court continued, "where it is clear that Congress had an intention on the precise question at issue." *Id.* The Board, however, had not exercised its own judgment in interpreting the statute; instead, the Board (and the Fifth Circuit) had viewed the question as having been decided in *Fedorenko*, which interpreted the persecutor bar in the Displaced Persons Act of 1948, Pub. L. No. 80-774, 62 Stat 1009 ("DPA"). *Negusie*, 555 U.S. at 518–23. The Court explained that the DPA has a different "textual structure" from the INA and is "a different statute enacted for a different purpose." *Id.* at 519, 520. Therefore, the Court remanded for the Board to make a "determination of the statutory interpretation question and its application to this case" in the first instance. *Id.* at 524; *see id.* at 514 ("We reverse and remand for the agency to interpret the statute, free from the error, in the first instance."). The Court acknowledged that reliance on *Fedorenko* "is not without some basis," and directed the Board and any reviewing court to consider "[w]hatever weight or relevance these various authorities may have in interpreting the statute." *Id.* at 518, 520.

On June 28, 2018, the Board concluded that "[r]ecognizing a narrow duress exception" to the persecutor bar is "the best of the permissible approaches." *Matter of Negusie*, 27 I&N Dec. 347, 353 (BIA 2018). The Board reasoned that an exception for duress "is reasonable because it fulfills the purpose of the persecutor bar and the overall purposes of the Refugee Act," and that such an exception "is also consistent with the purposes and implementation of" related international agreements. *Id.* As a result, the Board crafted a five-part test for a duress defense. *Id.* at 363. Yet when the Board applied this test to the respondent, it concluded that he had failed to show he was sufficiently under duress when he assisted in persecution as a guard in the Eritrean prison camp. *Id.* at 367–68.

In reaching its decision, the Board also held that "the initial burden is on the DHS to show evidence that indicates that the alien assisted or otherwise participated in persecution." *Id.* at 366 (citing *Matter of A-H-*, 23 I&N Dec. 774, 786 (A.G. 2005)). In response, "the burden shifts to the alien to show by a preponderance of the evidence that the persecutor bar does not apply, either because he did not engage in persecution or because he acted under duress." *Id.* at 367.

One Appellate Immigration Judge ("AIJ") concurred in the dismissal of the respondent's appeal, but dissented from the Board's recognition of a

duress exception to the persecutor bar.[2]  He acknowledged that "the lure" to create such an exception is "strong," but in his view, a "faithful application of the principles of statutory construction" shows that Congress "did not create a duress exception to the persecutor bar."  *Id.* at 369 (Malphrus, A.I.J., concurring and dissenting).

## II.

I consider first whether duress and coercion are relevant to the application of the persecutor bar.  For the reasons stated below, I conclude that there is no exception to the INA's persecutor bar for conduct that resulted from duress or coercion.

## A.

In *Negusie*, the Supreme Court held that the statutory language is ambiguous and remanded "to the agency for its initial determination of the statutory interpretation question and its application to this case."  555 U.S. at 517–18, 524.  On remand, the Board declined to perform any additional statutory analysis, perhaps believing that such analysis was outside the scope of its mandate from the Court.  But while the bare language of the persecutor bar is susceptible to multiple interpretations, a careful analysis of the persecutor bar's statutory context and history is instructive as to which of those possible interpretations is most coherent and consistent with the INA and best accommodates Department policy.  It is also entirely consistent with the Court's remand to the Department to determine, in the first instance, "whether an alien who was compelled to assist in persecution can be eligible for asylum or withholding of removal."  *Id*. at 516.

The "persecutor bar" in the INA is not a single statutory provision, but a collection of provisions and regulations that makes certain forms of immigration relief or protection unavailable to persecutors.  The INA excludes persecutors from the definition of "refugee" by expressly disqualifying "any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion."

---

[2]  On August 26, 2019, the Department adopted an interim rule providing that Board members shall also be known as AIJs.  Organization of the Executive Office for Immigration Review, 84 Fed. Reg. 44537, 44539; *see* 8 C.F.R. § 1003.1(a)(1) ("The Board members shall also be known as Appellate Immigration Judges.").  I use that terminology in this opinion.

*Id.* § 101(a)(42), 8 U.S.C. § 1101(a)(42). Nearly identical provisions also expressly deny granting persecutors asylum, *see id.* § 208(b)(2)(A)(i), 8 U.S.C. § 1158(b)(2)(A)(i), or withholding of removal, *see id.* § 241(b)(3)(B)(i), 8 U.S.C. § 1231(b)(3)(B)(i), and apply to withholding of removal under the CAT, *see* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, div. G, § 2242(c), 112 Stat. 2681-761, 2681–822, 8 U.S.C. § 1231 note; 8 C.F.R. § 1208.16(d)(2).[3] Persecutors nonetheless remain eligible for deferral of removal under the CAT. 8 C.F.R. §§ 1208.16(c)(4), 1208.17(a).

On their face, these provisions do not contain any exception for duress or coercion. They likewise do not require a showing that an alien "voluntarily" ordered, incited, assisted, or otherwise participated in persecution. The Supreme Court has repeatedly cautioned against reading words, elements, or implied exceptions into a statute. *See, e.g.*, *Dean v. United States*, 556 U.S. 568, 572 (2009); *Bates v. United States*, 522 U.S. 23, 29 (1997). Although the Court in *Negusie* explained that the absence of an express duress exception is not conclusive, 555 U.S. at 518, there is no question that Congress could have specified that the persecutor bar applies only to conduct undertaken voluntarily. The absence of such language provides strong evidence that the statute should be read to prohibit granting asylum to any applicant who has assisted in past persecution.[4]

---

[3]  These statutory provisions have broad application throughout immigration law. *See, e.g.*, INA § 207(c)(2), 8 U.S.C. § 1157(c)(2) (applying the persecutor bar to the admissibility of the spouse or child of a refugee admitted for humanitarian concerns); *id.* § 240A(c)(5), 8 U.S.C. § 1229b(c)(5) (applying the persecutor bar to cancellation of removal and adjustment of status); *id.* § 244(c)(2)(B)(ii), 8 U.S.C. § 1254a(c)(2)(B)(ii) (applying the persecutor bar to temporary protected status); *id.* § 316(f)(1), 8 U.S.C. § 1427(f)(1) (applying the persecutor bar to the naturalization of individuals who have made extraordinary contributions to national security); Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, tit. II, sec. 203(b), § 309(f)(1)(A)(i), 111 Stat. 2193, 2198 (1997), 8 U.S.C. § 1101 note (amending the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009-546, to apply the persecutor bar to special rule cancellation of removal); *see also* INA §§ 212(a)(3)(E)(i), 237(a)(4)(D), 8 U.S.C. §§ 1182(a)(3)(E)(i), 1227(a)(4)(D) (Holtzman Amendment) (additional persecutor bar making inadmissible and deportable any person who assisted or otherwise participated in persecution associated with Nazis); *id.* § 245A(a)(4)(C), 8 U.S.C. § 1255a(a)(4)(C) (additional persecutor bar to legalization).

[4]  Similarly, if Congress wanted the persecutor bar to require that an alien share in the persecutory motive, it could have rearranged the clauses in the persecutor bar to make that clear, i.e., "The term 'refugee' does not include any person who, *on account of race, religion, nationality, membership in a particular social group, or political opinion,* ordered, incited, assisted, or otherwise participated in the persecution of any person." *See*

The statute's context and history reinforce the absence of any express exception. As discussed below, Congress adopted the INA's current persecutor bar to asylum and withholding of removal in the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102. But for decades before, other statutes had barred aliens who had assisted in the persecution of others from entering or remaining in the United States. These statutes used language that was similar, if not identical, to that now in the INA, and they have been construed as having no exception for duress or coercion. Moreover, surrounding provisions in both the Refugee Act and the INA expressly require other kinds of disfavored conduct to have been voluntary, or otherwise create exceptions for excusable conduct, which highlights the absence of any voluntariness requirement in the persecutor bar. Indeed, the Board made clear in 1988 that the persecutor bar added by the Refugee Act had no duress exception, and Congress effectively endorsed that interpretation when it re-enacted the persecutor bar to withholding of removal, and added a new persecutor-bar provision applicable to asylum, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009-546 ("IIRIRA").

## 1.

Congress first adopted a persecutor bar in the DPA. Although Congress sought to facilitate the immigration of displaced persons from Europe after World War II, it excluded persons "who can be shown: (a) to have assisted the enemy in persecuting civil populations . . . ; or (b) to have voluntarily assisted the enemy forces . . . in their operations." Constitution of the International Refugee Organization, *opened for signature* Dec. 15, 1946, annex I, pt. II, § 2, 62 Stat. 3037, 3051–52, 18 U.N.T.S. 3, 20 ("IRO Constitution") (incorporated in DPA § 2(b)). In *Fedorenko*, the Supreme Court held that the persecutor bar in the DPA did not have an exception for duress or coercion. 449 U.S. at 512–13. The Court explained it was "unable to find any basis for an 'involuntary assistance' exception in the language of [the DPA]," and that "[t]he plain language of the Act mandates precisely the literal interpretation that the District Court rejected: an individual's service as a concentration camp armed guard—whether voluntary or involuntary—

---

*Alvarado v. Whitaker*, 914 F.3d 8, 13 (1st Cir. 2019); *Bah v. Ashcroft*, 341 F.3d 348, 351 (5th Cir. 2003); *cf. Maikovskis v. INS*, 773 F.2d 435, 445 (2d Cir. 1985). But Congress did not do so. Instead, the persecutor bar only necessitates that persecution be on account of some protected ground, and that an alien assisted or otherwise participated in that persecution.

made him ineligible for a visa." *Id.* at 512.  Comparing the persecutor bar with the adjoining prohibition applicable to persons who "*voluntarily* assisted" enemy forces, the Court reasoned that "Congress was perfectly capable of adopting a 'voluntariness' limitation where it felt that one was necessary . . . .   Under traditional principles of statutory construction, the deliberate omission of the word 'voluntary' . . . compels the conclusion that the statute made *all* those who assisted in the persecution of civilians ineligible for visas." *Id.* (some internal quotation marks omitted); *cf. United States v. Wittje*, 422 F.3d 479, 489 (7th Cir. 2005) (refusing to recognize a duress exception to an additional bar in the DPA on issuing a visa to "*any* person who is or has been a member of, or participated in, any movement which is or has been hostile to the United States" (quoting DPA § 13, 62 Stat. at 1014 (emphasis added)).

The Act of June 16, 1950, Pub. L. No. 81-555, 64 Stat. 219 ("1950 Act"), added a second persecutor bar to the DPA.  It provided that "[n]o visas shall be issued under the provisions of this Act . . . to any person who advocated or assisted in the persecution of any person because of race, religion, or national origin, or to any person who has voluntarily borne arms against the United States during World War II." *Id.* sec. 11, § 13, 64 Stat. at 227.  Courts have similarly declined to infer a duress exception to this prohibition.  *See United States v. Demjanjuk*, 367 F.3d 623, 637 (6th Cir. 2004); *United States v. Reimer*, 356 F.3d 456, 459–60 (2d Cir. 2004); *United States v. Schmidt*, 923 F.2d 1253, 1257–58 (7th Cir. 1991); *see also United States v. Koreh*, 59 F.3d 431, 439 (3d Cir. 1995); *United States v. Breyer*, 41 F.3d 884, 889–90 (3d Cir. 1994).  The 1950 Act demonstrated again that Congress knew how to distinguish between immigration bars applicable only to voluntary conduct (as when it referred to those who had "*voluntarily* borne arms" (emphasis added)) and those that apply without regard to voluntariness (as when it referred to those "who advocated or assisted in the persecution").

As originally enacted in 1952, the INA provided that certain "classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States."  Pub. L. No. 82-414, § 212(a), 66 Stat. 163, 182.  Many of the grounds of ineligibility that were based on membership or affiliation with certain groups were subject to an exception for membership or affiliation that "is or was involuntary."  *Id.* § 212(a)(28)(I), 66 Stat. at 186; *see also, e.g.*, *id.* § 313(d), 66 Stat. at 241 ("Any person who is within any of the classes described in subsection (a) [as ineligible for naturalization] solely because of past membership in, or past affiliation with, a party or organization may be naturalized . . . if such person establishes that such membership or affiliation is or was involuntary[.]"); *id.* § 350, 66 Stat. at 269 ("[a] person who acquired at birth the nationality of the

United States and of a foreign state and who has voluntarily sought or claimed benefits of the nationality of a foreign state shall lose his United States nationality" under certain circumstances). Other provisions of the INA made exceptions when the Attorney General found conduct to be "excusable." *See, e.g.*, *id.* § 241(a)(5), 66 Stat. at 204; *id.* § 266(b), 66 Stat. at 225. Thus, as it had twice done in the preceding five years (in the DPA and the 1950 Act), Congress created express exceptions to the INA's statutory bars for some, but not all, involuntary conduct.

Since the enactment of the INA, Congress has continued to make limited exceptions for disfavored conduct by aliens that was involuntary. For instance, the Refugee Relief Act of 1953, Pub. L. No. 83-203, 67 Stat. 400 ("RRA"), prohibited issuing a visa to "any person who personally advocated or assisted" persecution, *id.* § 14(a), 67 Stat. at 406, yet the adjacent subsection included an involuntariness exception for other visa bars, *see id.* § 14(b), 67 Stat. at 406 (incorporating the 1952 version of INA § 212(a)(28)(I), discussed above). The language of the RRA's persecutor bar did not provide an exception for duress or coercion, and courts have refused to infer one. *See United States v. Hansl*, 439 F.3d 850, 853–54 (8th Cir. 2006); *United States v. Kumpf*, 438 F.3d 785, 790–91 (7th Cir. 2006); *see also United States v. Friedrich*, 402 F.3d 842, 844–45 (8th Cir. 2005) (declining to consider an alien's motive for assisting in persecution).

Similarly, the Act of October 28, 1977, Pub. L. No. 95-145, 91 Stat. 1223 ("1977 Act"), addressed immigration from Vietnam and its neighbors. It, too, provided that "[a]ny alien who ordered, assisted, or otherwise participated in the persecution of any person because of race, religion, or political opinion shall be ineligible for permanent residence." *Id.* § 105, 91 Stat. at 1224. Again, the language of the statute did not include any voluntariness requirement.

The Holtzman Amendment in 1978, Pub. L. No. 95-549, 92 Stat. 2065, was the immediate predecessor to the INA's modern persecutor bar. Modeled after the DPA and the RRA, *see* H.R. Rep. No. 95-1452, at 2–3, 5 (1978), the Holtzman Amendment revised the INA to make inadmissible and deportable any person who, "under the direction of, or in association with" Nazi or Nazi-affiliated governments, had "ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion."[5] Prior to *Negusie*, the Board

---

[5]  Pub. L. No. 95-549, sec. 101(a)(2), § 212(a)(33), 92 Stat. at 2065 (formerly codified at 8 U.S.C. § 1182(a)(33) (Supp. II 1978), now located as amended at INA § 212(a)(3)(E)(i), 8 U.S.C. § 1182(a)(3)(E)(i)); *id.* sec. 103(a)(3), § 241(a)(19), 92 Stat. at 2065–66 (formerly

and the federal courts had almost universally agreed that the Holtzman Amendment did not contain any exception for duress or coercion. *See Naujalis v. INS*, 240 F.3d 642, 646 (7th Cir. 2001); *Matter of Kulle*, 19 I&N Dec. 318, 332 (BIA 1985), *aff'd*, 825 F.2d 1188 (7th Cir. 1987); *Matter of Fedorenko*, 19 I&N Dec. 57, 69–70 (BIA 1984), *abrogated by Negusie*, 555 U.S. at 521–23; *Matter of Laipenieks*, 18 I&N Dec. 433, 463–65 (BIA 1983), *abrogated by Negusie*, 555 U.S. at 521–23; *see also Szehinskyj v. Att'y Gen.*, 432 F.3d 253, 255–56, 261 (3d Cir. 2005) (holding that the persecutor bar in the DPA and the Holtzman Amendment have the same meaning); *Maikovskis v. INS*, 773 F.2d 435, 445–46 (2d Cir. 1985) (declining to consider an alien's motive for assisting in persecution).[6]

In 1980, Congress adopted a comprehensive refugee policy in the Refugee Act. *See id.* § 101(b), 94 Stat. at 102, 8 U.S.C. § 1521 note; *INS v. Stevic*, 467 U.S. 407, 425 (1984). The statute amended the INA to include a general persecutor bar applicable to both asylum and the withholding of deportation or return, which became withholding of removal. Refugee Act sec. 201(a), § 101(a)(42), 94 Stat. at 102–03 (codified as amended at 8 U.S.C. § 1101(a)(42)) (definition of "refugee"); *id.* sec. 203(e), § 243(h)(2)(A), 94 Stat. at 107 (formerly codified at 8 U.S.C. § 1253(h)(2)(A) (Supp. IV 1980), re-enacted as amended at INA § 241(b)(3)(B)(i), 8 U.S.C. § 1231(b)(3)(B)(i)) (withholding of removal). In so doing, Congress legislated against the backdrop of the prior persecutor bars, none of which included any exception for duress or coercion. The DPA, the 1950 Act, the RRA, the 1977 Act, and the Holtzman Amendment all barred persons who "assisted" in persecution, and the later statutes expanded the bar even further to those who "otherwise participated" in persecution. The persecutor bar added by the Refugee Act likewise applied to any person who had "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality,

---

codified at 8 U.S.C. § 1251(a)(19) (Supp. II 1978), now located as amended at INA § 237(a)(4)(D), 8 U.S.C. § 1227(a)(4)(D)).

[6]   One exception was the Sixth Circuit's decision in *Petkiewytsch v. INS*, 945 F.2d 871 (6th Cir. 1991), which considered voluntariness relevant to application of the Holtzman Amendment. *Petkiewytsch* was criticized as an outlier and was effectively abandoned by the Sixth Circuit in *Hammer v. INS*, 195 F.3d 836, 844 (6th Cir. 1999). *See, e.g.*, *Szehinskyj*, 432 F.3d at 259–61 ("To the extent that the Sixth Circuit's decision in *Petkiewytsch* . . . remains good law, we reject the Sixth Circuit's approach."); *United States v. Firishchak*, 426 F. Supp. 2d 780, 803 (N.D. Ill. 2005) ("The Seventh Circuit has thoroughly rejected the *Petkiewytsch* panel's interpretation of the Holtzman Amendment (as has every Circuit Court to consider the issue). Even the Sixth Circuit, which decided *Petkiewytsch*, no longer follows that decision." (citations omitted)), *aff'd*, 468 F.3d 1015 (7th Cir. 2006).

membership in a particular social group, or political opinion." *Id.* sec. 201(a), § 101(a)(42), 94 Stat. at 102–03; *id.* sec. 203(e), § 243(h)(2)(A), 94 Stat. at 107.

Congress's consistent use of the same language over time, especially in regard to the same subject matter and even the same underlying statute, strongly suggests that Congress intended that language to have the same meaning. *See Erlenbaugh v. United States*, 409 U.S. 239, 243–44 (1972) ("The rule of *in pari materia*—like any canon of statutory construction—is a reflection of practical experience in the interpretation of statutes: a legislative body generally uses a particular word with a consistent meaning in a given context."); *Matter of Acosta*, 19 I&N Dec. 211, 222–23 (BIA 1985), *modified on other grounds*, *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987) ("It is a basic rule of statutory construction that words used in an original act or section, that are repeated in subsequent legislation with a similar purpose, are presumed to be used in the same sense in the subsequent legislation."). Nothing in the language of the INA's current persecutor bar or the history of the statutes that preceded it provides a compelling reason to depart from that conclusion.

## 2.

In *Negusie*, the Supreme Court rejected the argument that its prior interpretation of the DPA's persecutor bar in *Fedorenko* determines the scope of the persecutor bar in the INA. The persecutor bar in the Refugee Act differs from the one incorporated in the DPA in that it does not include a parallel provision that denies admission of persons to the United States who "voluntarily" committed different kinds of acts. *See* IRO Constitution, annex I, pt. II, § 2, 62 Stat. at 3051–52, 18 U.N.T.S. at 20 (incorporated in DPA § 2(b)) (excluding from its provisions persons "who can be shown: (a) to have assisted the enemy in persecuting civil populations . . . ; or (b) to have voluntarily assisted the enemy forces . . . in their operations"); *see also Negusie*, 555 U.S. at 518–19 (noting this difference between the DPA and the INA). Because Congress had not adopted such a contrasting provision "in any subsection of the persecutor bar," the Court held that *Fedorenko* would not foreclose the argument that the persecutor bar includes an implied exception for duress. *Negusie*, 555 U.S. at 519. But the Court was equally clear that this did not mean the INA's persecutor bar must be construed to include a voluntariness requirement. Instead, the Court held that the question must be determined by the Department in the first instance because "ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable

fashion." *Id*. at 523 (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005)); *see also id*. at 528 (Scalia, J., joined by Alito, J., concurring) ("It is to agency officials, not to the Members of this Court, that Congress has given discretion to choose among permissible interpretations of the statute."). The Court therefore held that the relevant agency officials (i.e., the Attorney General and the Board, which exercises the Attorney General's delegated authority, *id.* at 517) have the "interpretive authority" to determine which of the "permissible" readings of the statute to adopt. *Id.* at 522, 524.

Although *Fedorenko* is not controlling in the context of the Refugee Act, which is a different statute from the DPA, the existence of the voluntariness requirements in related immigration statutes surely bears upon the interpretive question presented. In resolving the ambiguity identified by the Supreme Court in *Negusie*, I find additional guidance in the contrast between the provisions at issue here and other provisions of the INA. To infer an exception for duress or coercion from the lack of some contrasting provision in the Refugee Act requiring voluntary conduct would ignore that, when the Refugee Act added the general persecutor bar to the INA, many other provisions in the INA specifically referred to voluntariness or made exceptions for when otherwise-prohibited conduct was "excusable." Section 212(a)(28)(I) of the INA, for example, created an exception from the bar on admission of members of various organizations if such membership was involuntary. 8 U.S.C. § 1182(a)(28)(I) (1976).[7]

"Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987) (alteration marks omitted) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)); *see also Matter of M-H-Z-*, 26 I&N Dec. 757, 761 (BIA 2016) (concluding that an ambiguous provision of the INA did not include an exception for duress after "look[ing] to 'the language and design of the statute as a whole'" (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)). Congress is further presumed to be aware of previous legislation on a particular subject. *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 185 (1988); *Erlenbaugh*,

---

[7] *See also, e.g.*, INA § 101(a)(13), 8 U.S.C. § 1101(a)(13) (1976) (exception from the term "entry" to the United States for permanent legal residents whose departure from the United States was unintended or involuntary); *id.* § 241(a)(5), 8 U.S.C. § 1251(a)(5) (deportation of aliens who fail to notify the Attorney General of a change in address unless "reasonably excusable or. . . not willful"); *id.* § 266(b), 8 U.S.C. § 1306(b) (same); *id.* § 348(a), 8 U.S.C. § 1459(a) (admissibility as evidence in immigration-related proceedings of statements made voluntarily to officers or employees of the United States).

409 U.S. at 244. The numerous provisions in the INA requiring voluntary conduct when Congress passed the Refugee Act supply a similar sort of contrast to the one that the Court found persuasive in *Fedorenko*. Although *Negusie* recognized that this interpretive inference is not compelled by *Fedorenko* itself, not entitled to the same weight as in *Fedorenko*, my review of the statutory context suggests to me, in the exercise of my statutory authority to interpret the INA, that Congress did not intend for the persecutor bar to include an exception for involuntary conduct.

**3.**

My reading of the persecutor bar is reinforced by subsequent statutory developments and the current INA. First, Congress re-enacted the existing persecutor bar to withholding of removal with minor technical amendments and added an entirely new persecutor-bar provision applicable to asylum when it enacted IIRIRA in 1996. *See* IIRIRA sec. 305(a)(3), § 241(b)(3)(B)(i), 110 Stat. at 3009-602 (codified at 8 U.S.C. § 1231(b)(3)(B)(i)) (withholding of removal);[8] *id.* sec. 604(a), § 208(b)(2)(A)(i), 110 Stat. at 3009-691 (codified at 8 U.S.C. § 1158(b)(2)(A)(i)) (asylum).[9] In so doing, the operative language remained unchanged and was carried over into the new provision. By that time, the Board had decided *Matter of Rodriguez-Majano*, 19 I&N Dec. 811, 814–15 (BIA 1988), *abrogated by Negusie*, 555 U.S. at 521–23, which made clear that the persecutor bar in the asylum and withholding-of-removal provisions of the INA did not have a duress exception. The Board and numerous courts had also concluded or reiterated in related contexts that the language "assisted" in "persecution" does not include a duress defense. *See, e.g.*, *Koreh*, 59 F.3d at 439 (1950 Act); *Breyer*, 41 F.3d at 889–90 (same); *Schmidt*, 923 F.2d at 1257–58 (same); *Matter of Kulle*, 19 I&N Dec. at 332 (Holtzman Amendment); *Matter of Fedorenko*, 19 I&N Dec. at 69–70 (same); *Matter of Laipenieks*, 18 I&N Dec. at 463–65 (same); *cf. Wittje*, 422

---

[8] The persecutor bar to withholding of removal was previously located at INA § 243(h)(2)(A), 8 U.S.C. § 1253(h)(2)(A) (Supp. IV 1980), as enacted by section 203(e) of the Refugee Act, 94 Stat. at 107.

[9] IIRIRA further amended the definition of "refugee," but did nothing to change the language or settled interpretation of the persecutor bar contained therein. *Id*. sec. 601(a)(1), §101(a)(42), 110 Stat. 3009-689 (codified at 8 U.S.C. § 1101(a)(42)). Prior to this time, Congress also amended the INA to prohibit a persecutor from receiving an adjustment of status to that of a lawful permanent resident. *See* Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, sec. 201(a), § 245A(a)(4)(C), 100 Stat. 3359, 3395 (codified at 8 U.S.C. § 1255a(a)(4)(C)).

F.3d at 489 (concluding the "plain language" of a bar in the DPA on issuing a visa to "'*any* person who is or has been a member of, or participated in, any movement which is or has been hostile to the United States or the form of government of the United States' . . . does not condition such participation or membership on whether the person was a volunteer or a conscript" (quoting DPA § 13, 62 Stat. at 1014 (emphasis added)). And the Supreme Court had held that the DPA's exclusion of aliens who "assisted" in "persecution" had no exception for duress or coercion. *See Fedorenko*, 449 U.S. at 512–13. Legislating against this backdrop, Congress re-enacted the INA's persecutor bar for withholding of removal, and added a new persecutor-bar provision applicable to asylum using the same language, but did nothing to unsettle the interpretation that the Board had adopted in 1988.

"Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change[.]" *Lorillard v. Pons*, 434 U.S. 575, 580 (1978); *see also Matter of Valazquez-Herrera*, 24 I&N Dec. 503, 515 (BIA 2008). Congress's enactment of IIRIRA buttressed the Board's 1988 interpretation that the persecutor bar contains no such exception. *See Comm'r v. Est. of Noel*, 380 U.S. 678, 682 (1965) ("We have held in many cases that such a long-standing administrative interpretation, applying to a substantially re-enacted statute, is deemed to have received congressional approval and has the effect of law."). I further presume, again, that the parallel language in the new provision of the persecutor bar "brings the old soil with it," *United States v. Davis*, 139 S. Ct. 2319, 2231 (2019) (internal quotation marks omitted), because the prior interpretation comes from the same statute and applies in the same context of immigration. *See also Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1762 (2018) ("When Congress used the materially same language . . . it presumptively was aware of the longstanding judicial interpretation of the phrase and intended for it to retain its established meaning."); *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 83 (2002) ("[O]n the point at issue, Congress used identical language, knowing full well what the [agency] had made of that language under the earlier statute."). If Congress disapproved of that interpretation and wanted to add an exception, "it would have been a simple enough matter to have done so." *Matter of Velazquez-Herrera*, 24 I&N Dec. at 515.

Second, IIRIRA also added a provision to the INA that allows for a previous grant of asylum to be terminated if "the alien has *voluntarily* availed himself or herself of the protection of the alien's country of nationality" by returning to it under certain circumstances. IIRIRA sec. 604(a), § 208(c)(2)(D), 110 Stat. at 3009-692–93 (emphasis added) (codified at 8 U.S.C. § 1158(c)(2)(D)). Significantly, this provision was part of the

amendments in the same subsection of IIRIRA as was the persecutor bar to withholding of removal.  *See id.* sec. 604(a), § 208(b)(2)(A)(i), 110 Stat. at 3309-691 (codified at 8 U.S.C. § 1158(b)(2)(A)(i)).  The contrast between the two provisions reinforces that "Congress was perfectly capable of adopting a 'voluntariness' limitation where it felt that one was necessary," *Fedorenko*, 449 U.S. at 512, and it was fully aware of its power to make that distinction when it enacted section 604(a) of IIRIRA, yet it chose not to limit the persecutor bar to voluntary conduct.

Third, in addition to imposing voluntariness requirements in other provisions in the INA, Congress has, in some instances, expressly delegated authority to create and apply new categories of waivers to certain immigration bars.  For instance, the Secretary of State and the Secretary of Homeland Security have authority to create waivers to the bars on admissibility related to terrorist activity.  INA § 212(d)(3)(B)(i), 8 U.S.C. § 1182(d)(3)(B)(i).  This delegation of authority includes unreviewable discretion that was carefully tailored with specific limitations, some of which distinguish between voluntary and involuntary prohibited conduct, and strict requirements to report any waivers to Congress.  *Id.* § 212(d)(3)(B)(i), (ii), 8 U.S.C. § 1182(d)(3)(B)(i), (ii).  The Secretary of Homeland Security affirmatively exercised that authority to create a waiver for duress to the bar on admissibility for aliens who have provided material support for terrorism. *See* Exercise of Authority Under Section 212(d)(3)(B)(i) of the Immigration and Nationality Act, 72 Fed. Reg. 26138 (May 8, 2007); Exercise of Authority Under Sec. 212(d)(3)(B)(i) of the Immigration and Nationality Act, 72 Fed. Reg. 9958 (Mar. 6, 2007).[10]  Congress responded by requiring

---

[10]  *See also* Exercise of Authority Under Section 212(d)(3)(B)(i) of the Immigration and Nationality Act, 76 Fed. Reg. 14419 (Mar. 16, 2011) (creating a waiver for duress for aliens who solicited funds or members for a terrorist organization); Exercise of Authority Under Section 212(d)(3)(B)(i) of the Immigration and Nationality Act, 76 Fed. Reg. 14418 (Mar. 16, 2011) (creating a waiver for duress for aliens who received military-type training from, or on behalf of, a terrorist organization).

DHS refers to these waivers as discretionary "exemptions."  *See, e.g.*, U.S. Citizenship and Immigration Services ("USCIS"), DHS, *Implementation of New Discretionary Exemption Under INA Section 212(d)(3)(B)(i) For the Solicitation of Funds or Members under Duress*, PM-602-0031 (Feb. 23, 2011), https://www.uscis.gov/sites/default/files/ document/memos/TRIG_SolicitationPM.pdf; USCIS, DHS, *Implementation of New Discretionary Exemption Under INA Section 212(d)(3)(B)(i) for the Receipt of Military-Type Training Under Duress*, PM-602-0030 (Feb. 23, 2011), https://www.uscis. gov/sites/default/files/document/memos/TRIG_Military_TypeTrainingPM.pdf; Jonathon Scharfen, Deputy Director, USCIS, DHS, *Re: Processing the Discretionary Exemption to the Inadmissibility Ground for Providing Material Support to Certain Terrorist*

additional reports specific to waivers for duress, including the factors considered when evaluating duress, the number of aliens claiming duress to avoid the material-support bar, and a breakdown of the types of terrorist organizations to which they provided material support. Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, div. J, § 691(e), 121 Stat. 1844, 2365, 8 U.S.C. § 1182 note.

Congress's decision to delegate authority to create and apply waivers to certain immigration bars implies that a duress exception to the persecutor bar should not be lightly inferred. *See Cardoza-Fonseca*, 480 U.S. at 432; *Russello*, 464 U.S. at 23; *see also Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985) ("The assumption of inadvertent omission is rendered especially suspect upon close consideration of . . . a comprehensive and reticulated statute." (internal quotation marks omitted)). Congress provided the express authority to create and apply waivers in the context of terrorist activity, including for duress, but did not provide similar authority to determine the persecutor bar shall not apply.

Indeed, Congress has created in the immigration laws an "interlocking, interrelated, and interdependent . . . scheme." *Mass. Mut. Life Ins. Co.*, 473 U.S. at 146. The INA is replete with express statutory exceptions.[11] Those

---

*Organizations* (May 24, 2007), https://www. uscis.gov/sites/default/files/document/news/ MaterialSupport_24May07.pdf; *see also Terrorism-Related Inadmissibility Grounds Exemptions*, USCIS, DHS, https://www.uscis.gov/laws-and-policy/other-resources/terrorism-related-inadmissibility-grounds-trig/terrorism-related-inadmissibility-grounds-exemptions (last updated Nov. 11, 2019).

[11] *See, e.g.*, INA § 208(a)(2)(A), 8 U.S.C. § 1158(a)(2)(A) (exception to the bar on asylum for aliens who can be removed to a safe third country pursuant to an international agreement); *id.* § 208(b)(2)(A)(v), 8 U.S.C. § 1158(b)(2)(A)(v) (exception to the bar on asylum relating to terrorist activity); *id.* § 212(a)(2)(A)(ii), 8 U.S.C. § 1182(a)(2)(A)(ii) (exception to the inadmissibility of aliens who have committed a crime of moral turpitude); *id.* § 212(a)(2)(H)(iii), 8 U.S.C. § 1182(a)(2)(H)(iii) (exception to the inadmissibility of beneficiaries of human trafficking offenses); *id.* § 212(a)(3)(B)(ii), 8 U.S.C. § 1182(a)(3)(B)(ii) (exception to the inadmissibility of a spouse or child of aliens involved in terrorist activity); *id.* § 212(a)(3)(C)(ii), (iii), 8 U.S.C. § 1182(a)(3)(C)(ii), (iii) (exceptions to the inadmissibility of aliens whose entry would have serious adverse foreign policy consequences); *id.* § 212(a)(3)(D)(iii), (iv), 8 U.S.C. § 1182(a)(3)(D)(iii), (iv) (exceptions to the inadmissibility of Communist or totalitarian party members or affiliates); *id.* § 212(a)(6)(A)(ii), 8 U.S.C. § 1182(a)(6)(A)(ii) (exception to the inadmissibility of persons present in the United States without admission or parole); *id.* § 212(a)(6)(C)(ii)(II), 8 U.S.C. § 1182(a)(6)(C)(ii)(II) (exception to the inadmissibility of persons who falsely represent themselves as citizens of the United States under certain circumstances); *id.* § 212(a)(9)(A)(iii), 8 U.S.C. § 1182(a)(9)(A)(iii) (exception to the inadmissibility of certain aliens previously removed); *id.* § 212(a)(9)(B)(iii), (C)(ii), 8 U.S.C.

exceptions include conduct that is involuntary or excusable.[12] They include provisions granting executive officials the authority to waive statutory prohibitions under defined circumstances.[13] And they include express

§ 1182(a)(9)(B)(iii), (C)(ii) (exception to the inadmissibility of certain aliens who were unlawfully present in the United States before previous departure or removal); *id.* § 212(a)(10)(C)(iii), 8 U.S.C. § 1182(a)(10)(C)(iii) (exception to the inadmissibility of international child abductors); *id.* § 212(a)(10)(D)(ii), 8 U.S.C. § 1182(a)(10)(D)(ii) (exception to the inadmissibility of unlawful voters).

[12] *See, e.g.*, INA § 212(a)(3)(D)(ii), 8 U.S.C. § 1182(a)(3)(D)(ii) (exception to the inadmissibility of Communist or totalitarian party members or affiliates if involuntary); *id.* § 237(a)(3), 8 U.S.C. § 1227(a)(3) (exception to deportability resulting from failure to provide notice of change of address if excusable); *id.* § 313(d), 8 U.S.C. § 1424(d) (exception to the bar on naturalization of Communist or totalitarian party members or affiliates if involuntary); *see also id.* § 208(c)(2)(D), 8 U.S.C. § 1158(c)(2)(D) (termination of asylum if the alien voluntarily avails himself or herself of the protection of certain other countries); *id.* § 212(d)(3)(B)(i), 8 U.S.C. § 1182(d)(3)(B)(i) (limiting the authority of the Secretary of Homeland Security and the Secretary of State to create new categories of waivers if certain conduct was voluntary); *id.* § 349(a), 8 U.S.C. § 1481(a) (loss of nationality by voluntary and intentional conduct).

[13] *See, e.g.*, INA § 207(c)(3), 8 U.S.C. § 1157(c)(3) (limited discretion to waive restrictions on the admissibility of refugees); *id.* § 209(c), 8 U.S.C. § 1159(c) (limited discretion to waive restrictions on adjustment of status for refugees); *id.* § 212(a)(3)(D)(iv), 8 U.S.C. § 1182(a)(3)(D)(iv) (limited discretion to waive the inadmissibility of Communist or totalitarian party members or affiliates); *id.* § 212(a)(9)(B)(v), (C)(iii), 8 U.S.C. § 1182(a)(9)(B)(v), (C)(iii) (limited discretion to waive the inadmissibility of certain aliens who were unlawfully present in the United States before a previous departure or removal); *id.* § 212(d)(1), 8 U.S.C. § 1182(d)(1) (limited discretion to waive certain grounds of inadmissibility for informants); *id.* § 212(d)(3)(A), (4), 8 U.S.C. § 1182(d)(3)(A), (4) (limited discretion to waive certain grounds of inadmissibility for nonimmigrants); *id.* § 212(d)(11), 8 U.S.C. § 1182(d)(11) (limited discretion to waive the inadmissibility of aliens who encourage, induce, assist, abet, or aid unlawful entry to the United States); *id.* § 212(d)(12), 8 U.S.C. § 1182(d)(12) (limited discretion to waive the inadmissibility of aliens who falsify immigration documents); *id.* § 212(d)(13)(B), 8 U.S.C. § 1182(d)(13)(B) (limited discretion to waive certain grounds of inadmissibility for victims of human trafficking); *id.* § 212(e), 8 U.S.C. § 1182(e) (limited discretion to waive the foreign residence requirement for temporary educational visitors who seek to alter their status); *id.* § 212(g), 8 U.S.C. § 1182(g) (limited discretion to waive the inadmissibility of certain aliens who have a communicable disease of public health significance); *id.* § 212(h), 8 U.S.C. § 1182(h) (limited discretion to waive the inadmissibility of certain criminal aliens); *id.* § 212(i), 8 U.S.C. § 1182(i) (limited discretion to waive the inadmissibility of certain aliens who seek to obtain immigration benefits through fraud or willful misrepresentation); *id.* § 212(k), 8 U.S.C. § 1182(k) (limited discretion to waive certain grounds of inadmissibility for aliens who possess immigrant visas); *id.* § 212(l)(1), 8 U.S.C.

authority to create new categories of waivers.[14] But none of these express exceptions apply to the persecutor bar, which "provide[s] strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly." *Id.*

For over seventy years the immigration laws of the United States have imposed an absolute bar on various forms of immigration benefits for those who have assisted in persecution. Decisions by both the Board and the courts have consistently reaffirmed that the various persecutor bars imply no exception for involuntary conduct, including conduct perpetuated under duress or coercion. Although the Supreme Court concluded that the Refugee Act is ambiguous, the current persecutor bar's place in the history of statutory provisions counsels strongly against recognizing an exception for duress or coercion.

**B.**

The Board inferred the existence of a duress exception to the persecutor bar based largely upon its view that Congress intended the persecutor bar to comport with international agreements and the international understanding of those agreements. *Matter of Negusie*, 27 I&N Dec. at 353–60. It is true that "one of Congress'[s] primary purposes in passing the Refugee Act was to implement the principles agreed to in the 1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6224, T.I.A.S. [No.] 6577 (1968) [("1967 Protocol")]." *Negusie*, 555 U.S. at 520 (internal quotation marks omitted); *see Cardoza-Fonseca*, 480 U.S. at 436–37 (citing H.R. Rep. No. 96-781, at 19 (1980) (Conf. Rep.); H.R. Rep. No. 96-608, at 9 (1979); S. Rep. No. 96-256, at 4 (1979)). And the 1967 Protocol, in turn, incorporated certain provisions of the earlier Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 ("1951 Convention"), an agreement to which the United States was not a party.

Yet I believe that the Board erred by inferring a duress exception to align the persecutor bar with the 1967 Protocol and the 1951 Convention. The 1951 Convention provides for the protection of refugees, but those protections do not apply if there are "serious reasons for considering" that the person "has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes," or "has committed a serious

---

§ 1182(l)(1) (limited discretion to waive passport or visa requirements for nonimmigrants visiting Guam or the Commonwealth of the Northern Mariana Islands).

[14] *See, e.g.*, INA § 212(d)(3)(B)(i), 8 U.S.C. § 1182(d)(3)(B)(i).

non-political crime outside the country of refuge prior to his admission," or "has been guilty of acts contrary to the purposes and principles of the United Nations." 1951 Convention art. 1F, 19 U.S.T. at 6263–64, 189 U.N.T.S. at 156. Neither the 1967 Protocol nor the 1951 Convention contains any express exception for duress or coercion that would apply to these exclusion clauses. Nor does either agreement contain a voluntariness requirement to such exclusions, even though other provisions in the 1951 Convention, incorporated by the 1967 Protocol, do include such language. *See* 1951 Convention art. 1C(1), (2), (4), 19 U.S.T. at 6262, 189 U.N.T.S. at 154. Although the Supreme Court has found that "it is proper, of course, to refer to the records of its drafting and negotiation" in interpreting a treaty, *Air Fr. v. Saks*, 470 U.S. 392, 400 (1985), neither the Board nor the respondent has pointed to anything in the drafting and negotiation records to support a duress defense.

Moreover, the 1951 Convention's provisions for the protection of refugees do not apply if there are "serious reasons for considering" that the person engaged in the prohibited conduct. 1951 Convention art. 1F, 19 U.S.T. at 6263, 189 U.N.T.S. at 156. If an alien has concededly committed or assisted in persecution, then the United States certainly has "serious reasons" for believing that the alien has committed a disqualifying crime. The Board observed that the 1951 Convention uses terms of criminal culpability in the exclusion clauses—specifically, crimes against peace, war crimes, and crimes against humanity—and, citing various international instruments, reasoned therefore that criminal defenses should apply. *Matter of Negusie*, 27 I&N Dec. at 357–60. But the possibility that duress or coercion, if established, may excuse an otherwise criminal act does not mean that there were not "serious reasons" for believing that alien had committed the crime in the first place. *Cf. Hernandez v. Sessions*, 884 F.3d 107, 111–12 (2d Cir. 2018).

In fact, as the Supreme Court has explained, the 1967 Protocol (incorporating provisions of the 1951 Convention) "did not require admission at all, nor did it preclude a signatory from exercising judgment among classes of refugees within the Protocol definition in determining whom to admit." *Stevic*, 467 U.S. at 428 n.22. Instead, it "merely called on nations to facilitate the admission of refugees *to the extent possible*," using language that was "precatory and not self-executing." *Id.* at 428–29 n.22.

Although the Board did not identify any express exception for duress or coercion, it relied on the *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and 1967 Protocol Relating to the Status of Refugees* ("U.N. Handbook"), issued by the United Nations High Commissioner for Refugees ("UNHCR"), which directs a

"restrictive" application of the exclusion clauses. U.N. Handbook ¶¶ 149, 180 (1992).[15] The Background Note then encourages consideration of duress as a defense to the criminal offenses on which the exclusion of persecutors is based. UNHCR, *Background Note on the Application of the Exclusion Clauses: Article 1F of the 1951 Convention Relating to the Status of Refugees*, ¶¶ 69, 70 (2003) ("Background Note").[16] The Board also found it persuasive that other parties to the 1951 Convention, including Australia, Canada, New Zealand, and the United Kingdom, have excluded coerced acts from the persecutor bar. *Matter of Negusie*, 27 I&N Dec. at 359–60.

The Supreme Court has been clear, however, that "[t]he U.N. Handbook may be a useful interpretative aid, but it is not binding on the Attorney General, the [Board], or United States courts." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999). "[T]he Handbook itself disclaims such force, explaining that 'the determination of refugee status under the 1951 Convention and the 1967 Protocol . . . is incumbent upon the Contracting State in whose territory the refugee finds himself.'" *Cardoza–Fonseca*, 480 U.S. at 439 n.22 (quoting U.N. Handbook ¶ II (1979)) (second alteration in *Cardoza–Fonseca*). Indeed, the U.N. Handbook was first published in 1979, more than a decade after the United States signed the 1967 Protocol, and it is not dispositive even when domestic law *must* comport with the 1967 Protocol.[17] The Background Note came more than two decades after the

---

[15] The respondent also quotes U.N. Handbook ¶ 157 (1992) for the premise that "all the relevant factors—including any mitigating circumstances—must be taken into account," which refers to the exclusion of persons who have committed serious non-political crimes. *See* 1951 Convention, art. 1F(b), 19 U.S.T. at 6264, 189 U.N.T.S. at 156. But the 1951 Convention made no attempt to define "serious non-political crime," leaving signatories to that agreement (or the 1967 Protocol) with discretion to define the offenses, even in a way that does not account for duress or coercion.

[16] The respondent looks instead to the UNHCR's *Guidelines on International Protection: Application of the Exclusion Clauses: Article 1F of the 1951 Convention Relating to the Status of Refugees* ("Guidelines"), for the same proposition. Guidelines ¶ 22 (2003).

[17] Pointing to the fact that the U.N. Handbook was published prior to the enactment of the Refugee Act, the respondent argues that Congress was aware of that interpretation and intended to incorporate it into the Refugee Act. This is a questionable assertion. As the Board explained in *Matter of Acosta*: "The *Handbook* was issued in September 1979, whereas hearings on the Refugee Act were held in March and May 1979, and the Senate Judiciary Committee issued its report in July 1979. Thus, it is highly unlikely that Congress consulted the *Handbook* while drafting the definition of a refugee in the Refugee Act of 1980." 19 I&N Dec. at 221 n.8. Congress may be presumed to be aware of existing federal laws, judicial decisions, and administrative interpretations, but we do not believe such a principle may be readily extended to non-binding texts published by international organizations.

Handbook (and the Refugee Act), and, even then, explicitly conceded that the grounds for exclusion under the 1951 Convention are "subject to interpretation." Background Note ¶ 7. These subsequent international materials are of limited value when compared to the distinct development of this nation's domestic law and the strong textual evidence that the persecutor bar added by the Refugee Act in 1980, provisions of which were then re-enacted or added by IIRIRA, has no exception for duress or coercion. Decisions by only a handful of 149 parties to sign either the 1951 Convention or the 1967 Protocol—made after the United States acceded to the 1967 Protocol, Congress passed the Refugee Act, the Board concluded the persecutor bar did not require voluntary conduct, and Congress enacted IIRIRA—do not warrant a different decision.[18]

In any event, the 1967 Protocol is not self-executing and does not itself create any private, enforceable rights. *See Hernandez v. Sessions*, 884 F.3d at 111; *Yuen Jin v. Mukasey*, 538 F.3d 143, 159 (2d Cir. 2008) (collecting cases).[19] Even if one assumes that the principles of the 1967 Protocol and the 1951 Convention support a duress exception to the persecutor bar, the 1967 Protocol cannot itself be the source of an exception to a federal statute. To understand *the extent* to which Congress incorporated the principles of the 1967 Protocol into domestic law, one must consider the terms of the implementing statutes and regulations. *Yuen Jin*, 538 F.3d at 159; *cf.*

---

In addition, the Board has previously recognized that the U.N. Handbook does not always adopt the most accurate interpretation of the 1967 Protocol. *See Matter of M-E-V-G-*, 26 I&N Dec. 227, 248–49 (BIA 2014); *Matter of Acosta*, 19 I&N Dec. at 228; *cf. Aguirre-Aguirre*, 526 U.S. at 425–28; U.N. Handbook, Foreword (2019) ("The 1951 Convention has proven to be a living and dynamic instrument, and its interpretation and application has continued to evolve through State practice, UNHCR Executive Committee conclusions, academic literature and judicial decisions at national, regional and international levels."); Guidelines, Foreword (2019) ("An update of these Guidelines was also deemed necessary in light of contemporary developments in international law.").

[18] *See also Prosecutor v. Erdemović*, Case No. IT-96-22-A, Joint Separate Opinion of Judge McDonald and Judge Vohrah, ¶ 67 (Int'l Crim. Trib. for the Former Yugoslavia Oct. 7, 1997) ("The rules of the various legal systems of the world are . . . largely inconsistent regarding the specific question whether duress affords a complete defence to a combatant charged with a war crime or a crime against humanity involving the killing of innocent persons.").

[19] *Cf. Medellín v. Texas*, 552 U.S. 491, 506 n.3 (2008) ("Even when treaties are self-executing in the sense that they create federal law, the background presumption is that '[i]nternational agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts.'" (quoting 2 Restatement (Third) of Foreign Relations Law of the United States § 907 cmt. a, at 395 (1986)) (alteration in *Medellin*)).

*Cardoza-Fonseca*, 480 U.S. at 431–32 ("With regard to this very statutory scheme, we have considered ourselves bound to assume that the legislative purpose is expressed by the ordinary meaning of the words used." (internal quotation marks omitted)).  As explained above, the Refugee Act, IIRIRA, and the context provided by other provisions in the INA cut against inferring a duress exception.

The United States acceded to the 1967 Protocol only after concluding it "was largely consistent with existing law."  *Stevic*, 467 U.S. at 417–18.  Quoting a committee report, the Supreme Court in *Stevic* recognized that "the new definition [of 'refugee'] does not create a new and expanded means of entry, but instead regularizes and formalizes the policies and [the] practices that have been followed in recent years."  *Id.* at 426 (quoting H.R. Rep. No. 96-608, at 10); *see also id.* at 417 ("And it was 'absolutely clear' that the Protocol would not 'requir[e] the United States to admit new categories or numbers of aliens.'" (quoting S. Exec. Rep. No. 90-14, at 19 (1968)) (alteration in *Stevic*)).  That same committee report itself emphasized the persecutor bar, explaining that the Refugee Act would "add[] language specifically to exclude from the definition of 'refugee' those who themselves engaged in persecution," and that the addition would be "consistent with the U.N. Convention . . . , and with the two special statutory enactments under which refugees were admitted to this country after World War II, *the Displaced Persons Act of 1948 and the Refugee Relief Act of 1953*."  H.R. Rep. No. 96-608, at 10 (emphasis added).  As discussed above, the DPA and the RRA contained no exceptions for duress or coercion, as courts have consistently found.  Thus, the committee report invoked by *Stevic* supports the conclusion that the Refugee Act also had no such exception.[20]

---

[20]  In his separate opinion in *Negusie*, Justice Stevens concluded that the 1967 Protocol and the 1951 Convention "place a mandatory obligation" on the United States not to return refugees to countries where their life or freedom would likely be threatened on account of a protected ground.  555 U.S. at 535 (Stevens, J., joined by Breyer, J., concurring in part and dissenting in part).  He recognized that the 1951 Convention excludes from this obligation aliens who have "committed a crime against peace, a war crime, or a crime against humanity," but reasoned that an alien would not be convicted if the acts were coerced or under duress.  *Id.* at 536 (quoting 1951 Convention, art. 1F(a), 19 U.S.T. at 6263, 189 U.N.T.S. at 156).  The 1951 Convention, however, does not address the impact of any such defenses and, in my judgment, does not outweigh the other contextual, historical, and policy considerations discussed in this opinion.

Moreover, any inference to be drawn from the 1951 Convention applies with significantly less force in the context of asylum, because the 1951 Convention left significant discretion with signatory parties about who to admit, *see Stevic*, 467 U.S. at 428 n.22, allowing for a persecutor bar with no duress exception.  And implications from

I therefore conclude that our international agreements do not compel an interpretation of the INA's persecutor bar that includes an exception for duress or coercion. Neither the 1967 Protocol nor the 1951 Convention can overcome the text, context, and history of the persecutor bar, and indeed, neither agreement's text contains such an exception. To the extent that the U.N. Handbook, Background Note, or the practice of other states has recognized such an exception, I believe that those considerations are outweighed by the text of the 1967 Protocol's implementing legislation and the other contextual, historical, and policy considerations discussed in this opinion.

Finally, I believe that this conclusion is consistent with my responsibility to consider the diplomatic repercussions that may arise if the United States were to grant protection or relief to an alien who has assisted in persecution. As the Supreme Court has recognized, the "decision to bar an alien who has participated in persecution 'may affect our relations with [the alien's native] country or its neighbors.'" *Negusie*, 555 U.S. at 517 (quoting *Aguirre-Aguirre*, 526 U.S. at 425) (alteration in *Negusie*). The United States has maintained for decades a bar on granting asylum or withholding of removal to persecutors regardless of duress or coercion, and this decision will be consistent with that landscape. Applying that bar here will avoid the potential diplomatic controversy that may arise where the United States grants protection or relief to an alien who has committed acts of persecution in his home country.

## C.

The respondent has raised several additional arguments in support of a duress exception to the persecutor bar, but none is persuasive. First, the respondent argues that the term "persecution" itself requires morally culpable conduct, and therefore, involuntary conduct is not persecution in the first place. Relying on the *Oxford English Dictionary*, he contends that "persecution" is defined as "the action of pursuing or persecuting a person or group with hostile intent," and that it derives from a Latin root meaning "to seek out, to pursue, to follow with hostility and malignity . . . on religious grounds." Respondent's Br. 14 (internal quotation marks omitted).

---

words of criminal culpability in the 1951 Convention do not account for IIRIRA, where Congress re-enacted or added persecutor-bar provisions against the background of an authoritative interpretation of the persecutor bar that did not recognize duress or coercion as a defense.

The Board dismissed this argument succinctly: "We disagree with the applicant's contention that acts that would otherwise qualify as 'persecution' are not 'persecution' if taken under duress. This is not how the defense of duress has been applied in our sister jurisdictions and, as previously explained, it is inconsistent with how the defense of duress has been interpreted in American courts." *Negusie*, 27 I&N Dec. at 366 n.21. Duress and coercion do not negate the underlying unlawful conduct, but instead operate as an affirmative defense or excuse. *See Dixon v. United States*, 548 U.S. 1, 6–7 & n.5 (2006) ("The duress defense . . . may excuse conduct that would otherwise be punishable, but the existence of duress normally does not controvert any of the elements of the offense itself."); Wayne R. LaFave, *Substantive Criminal Law* § 9.7, at 648–60 (6th ed. 2017).[21]

In any event, whether or not persecution requires at least one perpetrator to have a punitive motive, the persecutor bar would still apply to a person, like the respondent, who assisted in such conduct. *See, e.g.*, INA § 101(a)(42), 8 U.S.C. § 1101(a)(42) ("The term 'refugee' does not include any person who . . . *assisted* . . . in the persecution of any person[.]" (emphasis added)); *Alvarado v. Whitaker*, 914 F.3d 8, 13 (1st Cir. 2019) ("[T]he pertinent inquiry is whether the persecution was motivated by protected grounds. By contrast, no such limitation is attached to the actions of the person who assists."); *supra* note 4. Both courts and the Board have recognized in the past that the plain meaning of the term "assisted" has no inherent voluntariness requirement and does not require any specific intent. *See, e.g., Fedorenko*, 449 U.S. at 512–13; *Hansl*, 439 F.3d at 854 ("The district court correctly stated that '[t]he plain language of RRA section 14(a) does not contain a voluntariness requirement.' Absent the express use of the word 'voluntary,' we must conclude that the statute meant to include all those who assist in persecution."); *Kumpf*, 438 F.3d 790–91 ("[T]he plain language of the Refugee Relief Act lacks a voluntariness requirement."); *Bah v. Ashcroft*, 341 F.3d 348, 351 (5th Cir. 2003) ("Bah seeks to avoid the plain text of the statute by arguing that, given the fact of his forced recruitment, he did not engage in political persecution . . . . We reject this contention. The

---

[21] The Supreme Court noted that the Board's "interpretation of the statutory meaning of 'persecution' may be explained by a more comprehensive definition, one designed to elaborate on the term in anticipation of a wide range of potential conduct." *Negusie*, 555 U.S. at 524. The Board correctly declined to depart from its settled interpretation of "persecution." The respondent's claim of duress or coercion can be fully considered as an excuse to the application of the persecutor bar without upending the settled meaning of "persecution" against which Congress has repeatedly legislated, and on which the Board and courts have repeatedly based their decisions.

syntax of the statute suggests that the alien's personal motivation is not relevant."); *Maikovskis*, 773 F.2d at 445–46 ("As we read the actual language of [the Holtzman Amendment], it does not require proof that the alien identified himself with the Nazis' basis for persecution[.]"); *Matter of Laipenieks*, 18 I&N Dec. at 464 ("[W]e find that the plain language of the [Holtzman] Amendment mandates a literal interpretation, and that the omission of an intent element compels the conclusion that [it] makes all those who assisted in the specified persecution deportable."). [22] At the time Congress enacted the Refugee Act and IIRIRA, dictionaries defined "assist" as "[t]o give aid or support," *The American Heritage Dictionary of the English Language* 112 (3d ed. 1996) (def. 1); *The American Heritage Dictionary of the English Language* 80 (1980) (same), or "to help," *Oxford American Dictionary* 36 (1980). *See Matter of A-H-*, 23 I&N Dec. at 784 ("To 'assist' means 'to give support or aid: help." (quoting *Webster's Third New International Dictionary of the English Language Unabridged* 132 (2002)). An alien who assists in persecution involuntarily has nonetheless assisted. [23]

---

[22] The First Circuit in *Alvarado* observed that "[a] person who knowingly and voluntarily participates in persecution is sufficiently culpable to be held accountable under the persecutor bar," and noted that its decision did not "preclude . . . a well-developed argument" of duress or coercion. 914 F.3d at 14 & n.8 (footnote omitted). But the court was also clear that duress or coercion was not an issue it had been asked to consider. *Id.* at 14 n.8. Other courts have considered duress to be a factor in determining whether particular acts amounted to actual assistance. *See Hernandez v. Reno*, 258 F.3d 806, 812–15 (8th Cir. 2001). To the extent these opinions conclude that voluntariness should be relevant to the application of the persecutor bar, I respectfully disagree with them.

In *Matter of A-H-*, the Attorney General cited *Hernandez v. Reno* for the proposition that it is "appropriate to look at the totality of the relevant conduct in determining whether the bar to eligibility applies." *Matter of A-H-*, 23 I&N Dec. at 785 (citing *Hernandez v. Reno*, 258 F.3d at 814). But I do not read such a reference as endorsing the idea that duress or coercion is relevant to the persecutor bar and, to the extent there is any inconsistency, this opinion must control.

[23] The plain meaning of the catchall phrase "otherwise participate" in the persecutor bar likewise does not require voluntariness or specific intent. *See The American Heritage Dictionary of the English Language* 1319 (3d ed. 1996) (def. 1 of *participate*: "To take part in something[.]"); *The American Heritage Dictionary of the English Language* 955 (1980) (def. of *participate*: "To take part; join or share with others."); *Oxford American Dictionary* 487 (def. of *participate*: "to have a share, to take part in something"); *Matter of A-H-*, 23 I&N Dec. at 784 ("And to 'participate' means 'to take part in something (as an enterprise or activity) usu. in common with others.'" (quoting *Webster's Third New International Dictionary of the English Language Unabridged* 1646 (2002)). The Supreme Court has recognized that the word "participate" does not imply voluntariness. *Pa. Dep't*

Second, the respondent relies on general background principles of criminal law to argue that individuals should not suffer serious adverse consequences on the basis of involuntary acts. But the respondent has identified no cases applying this principle to immigration law, and it is well established that immigration proceedings do not require the protections of the criminal law. *See, e.g.*, *Nijhawan v. Holder*, 557 U.S. 29, 42 (2009) ("[A] deportation proceeding is a civil proceeding in which the Government does not have to prove its claim 'beyond a reasonable doubt.'"); *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038–39 (1984) ("Consistent with the civil nature of the proceeding, various protections that apply in the context of a criminal trial do not apply in a deportation hearing."); *Fong Yue Ting v. United States*, 149 U.S. 698, 730 (1893) (recognizing that an "order of deportation is not a punishment for crime"); *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999) ("Even when deportation is sought because of some act the alien has committed, in principle the alien is not being punished for that act (criminal charges may be available for that separate purpose) but is merely being held to the terms under which he was admitted.").[24]

The Board has rejected the general argument that "because duress may be a defense to negate culpability in the criminal context, an exception for duress should similarly apply" in the immigration context. *Matter of M-H-Z-*, 26 I&N Dec. at 763. The Board found the argument "to be misplaced because, unlike criminal proceedings, immigration proceedings are civil in nature." *Id.*; *see also Negusie*, 555 U.S. at 526 (Scalia, J., joined

---

*of Corr. v. Yeskey*, 524 U.S. 206, 211 (1998) ("Petitioners argue that the words 'eligibility' and 'participation' imply voluntariness . . . . This is wrong . . . because the words do not connote voluntariness."); *see also Wittje*, 422 F.3d at 489. Again, an alien who participates in persecution involuntarily has nonetheless participated.

The respondent attempts to equate assistance or participation in persecution with the imposition of criminal liability on anyone who "aids, abets, counsels, commands, induces, or procures" an offense against the United States, 18 U.S.C. § 2(a), including any related case law. There is no basis to equate assistance or participation in persecution with the criminal law terms "aids, abets, counsels, commands, induces, or procures." Those terms appear nowhere in the persecutor bar and are not relevant.

[24] Last year in *Alvarado*, the First Circuit referenced principles of criminal law to illustrate common notions of culpability in connection with holding that the persecutor bar applies to someone who assisted in persecution, even if that person did not share the persecutory motive. 914 F.3d at 14. Because immigration proceedings are not criminal in nature, I disagree that principles of criminal law are relevant to the interpretation of the persecutor bar. *See, e.g.*, *Hernandez v. Sessions*, 884 F.3d at 112; *Matter of M-H-Z-*, 26 I&N Dec. at 763–64.

by Alito, J., concurring) (recognizing that the duress defense in criminal cases does not support a similar defense to the persecutor bar in the INA); *Mehboob v. Att'y Gen.*, 549 F.3d 272, 277 n.3 (3d Cir. 2008) (immigration statutes need not "encompass separate statutory or common law defenses that are available to a criminal defendant").[25]  In arguing that involuntary acts should not lead to adverse consequences, the respondent ignores the fact that for decades, courts have applied various anti-persecution provisions in immigration law without making any exceptions for duress or coercion.

Third, the immigration rule of lenity would not alter the outcome here. As an initial matter, the INA's persecutor bar, when considered in its context and history, is sufficiently clear "that resort to the rule of lenity is not warranted." *Kawashima v. Holder*, 565 U.S. 478, 489 (2012).  The rule of lenity "'cannot apply to contravene the [Board]'s reasonable interpretation' of an immigration statute where the agency makes use of 'ordinary principles of statutory interpretation.'"  *Garcia v. Sessions*, 856 F.3d 27, 41 (1st Cir. 2017) (quoting *Soto-Hernandez v. Holder*, 729 F.3d 1, 6 (1st Cir. 2013)). Nor does lenity necessarily supersede the various policy considerations that I have taken into account.  Indeed, were it otherwise, the Supreme Court would have ended its analysis by ruling in the respondent's favor rather than remanding the case to allow the Department to resolve the statutory ambiguity.  *Cf. Aguirre-Aguirre*, 526 U.S. at 424–25 (reversing a court of appeals' decision for failure to give deference to a decision of the Board).

Fourth, the respondent argues that Congress's interest in granting the Attorney General discretion over asylum supports an exception to the mandatory persecutor bar.  I agree that Congress gave significant discretion to the Attorney General to resolve asylum claims.  *Cardoza-Fonseca*, 480 U.S. at 449–50.  This includes discretion to deny asylum to applicants who are eligible for it.   *See* INA § 208(b)(1)(A), 8 U.S.C. § 1158(b)(1)(A); *Cardoza-Fonseca*, 480 U.S. at 443–44.  But the authority to exercise discretion about when to grant asylum to those refugees who qualify for it does not include the discretion to grant asylum to aliens who are subject to a bar on asylum.

The INA contains some provisions granting broad discretion to the Attorney General, other provisions granting limited discretion, and still others offering no discretion at all.  My responsibility is to interpret and to

---

[25] *See also Matter of Negusie*, 27 I&N Dec. at 373 (Malphrus, A.I.J., concurring and dissenting) ("While duress may mitigate a criminal defendant's moral blameworthiness in military tribunals or criminal courts, the statutory scheme designed by Congress does not provide for mitigation of punishment, as in the criminal context.  Rather, it only permits us to determine whether the persecutor bar applies and, thus, whether an alien may or may not be eligible for the benefit of asylum and withholding of removal.").

apply each of those provisions faithfully, not to infer exceptions to statutory bars based on my general discretion over asylum decisions. Congress's decision to repeat the same language from other persecutor bars, and the multitude of other express exceptions discussed above (including for excusable conduct), many of which involve discretion, support the opposite assumption. In addition to enumerating categories of aliens who are statutorily excluded from certain immigration benefits, the Refugee Act itself creates exceptions to some restrictions on admissibility, and it allows the Attorney General to waive yet others. *See, e.g.*, Refugee Act sec. 201(b), § 207(c)(3), 94 Stat. at 104 (codified as amended at 8 U.S.C. § 1157(c)(3)) (providing exceptions for refugees from statutory bars on admissibility, and limited discretion to waive other restrictions on the admissibility of refugees). And where the Attorney General is given discretion by that statute, IIRIRA, or the INA, the terms of such discretion are often express and subject to particular conditions. *See supra* note 13.

That Congress vested discretion in the Attorney General (and hence in the Board as the Attorney General's delegatee) to deny asylum to otherwise-eligible applicants does not mean that the discretion must be available in every conceivable case. Nor does it suggest a rule of construction to infer exceptions to statutory bars in the Refugee Act, IIRIRA, and the INA. In fact, the INA originally gave the Attorney General discretion "to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to physical persecution," *id.* § 243(h), 66 Stat. at 214, but the Refugee Act amended the INA to remove that discretion, Refugee Act sec. 203(e), § 243(h)(1), 94 Stat at 107 (formerly codified at 8 U.S.C. § 1253(h)(1) (Supp. IV 1980), re-enacted as amended at INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A)). *See Cardoza-Fonseca*, 480 U.S. at 428–29. And while the respondent contends that I should assume discretion to grant asylum when it comes to the persecutor bar, he eschews the argument that the same assumption should apply to other bars, such as those for persons responsible for genocide, torture, or alien smuggling. The fact that the respondent is unwilling to extend his logic to other disfavored conduct provides strong evidence that it should also not apply to assistance in persecution.

The respondent also emphasizes that the Attorney General could always exercise discretion to grant asylum only to those who are truly worthy, thereby minimizing any adverse effects of creating an exception to the persecutor bar. But to the extent that the persecutor bar also precludes withholding of removal, the Attorney General's discretion to deny that protection is non-existent, because withholding of removal is now mandatory for eligible persons. *Id.* Although the respondent presents discretion in part

as a check on extending immigration benefits to especially undeserving aliens, a duress exception to the persecutor bar would *require* withholding of removal for any qualifying persecutor.

Finally, the respondent now contends that his coerced service as a prison guard was itself a form of persecution, and that an individual may not simultaneously be both persecuted and assisting in persecution—i.e., that a single act or circumstance cannot make an individual both persecuted and persecutor. *See* Respondent's Br. 19 (arguing that "forcing individuals to engage in persecutory acts is itself persecution that makes such individuals eligible for asylum"). Similarly, the respondent points to various scenarios that he is sure Congress would not have considered assistance in persecution within the meaning of the statute. But as a general matter, the persecutor bar applies to all individuals (including those who have been persecuted) and it necessarily contemplates the possibility that someone can be both a persecutor and a subject of persecution. *See Matter of McMullen*, 19 I&N Dec. 90, 97 (BIA 1984) ("This restriction on the scope of refugee status applies even though the person so excluded may, in fact, be the subject of persecution and notwithstanding that his persecution of others was politically motivated. The prohibited conduct is deemed so repugnant to civilized society and the community of nations that its justification will not be heard." (footnote omitted)); *cf. Negusie*, 555 U.S. at 545 (Thomas, J., dissenting) ("[F]ederal immigration law provides calibrated remedies, which include partial refuge for specified aliens who have both suffered from and inflicted persecution. . . . [F]or many individuals who (like [the respondent]) have both persecuted others and been persecuted, the scheme provides temporary refuge; they will receive deferral of removal under the CAT if they will face torture upon their return to their home country."). The issue here is not whether the respondent was persecuted, whether his conduct was actually assistance in persecution, or what other hypothetical conduct may, or may not, amount to such assistance. The respondent has conceded that he assisted in persecution. *See* Transcript of Hearing at 8:4–8, *Matter of Negusie*, 27 I&N Dec. 347. The sole question is whether to infer an exception to the persecutor bar for acts performed under coercion or duress, and that is not something that I believe is warranted in light of its text, context, and history, longstanding precedent, or relevant policy considerations within the scope of my discretion under the INA.

### D.

There are strong, additional policy reasons not to infer a duress exception to the persecutor bar. Recognizing an implicit, non-textual exception would

have significant negative consequences in the immigration arena. First, inferring a duress exception to the persecutor bar would not only depart from the INA and undermine the consistency of how other persecutor bars have been administered, but it would create substantial uncertainty in the application of other grounds for inadmissibility. The INA includes other bars to immigration relief that would presumably also be subject to implied exceptions under many of the same arguments pressed by the respondent.

The INA not only bars persecutors from certain forms of relief or protection from removal, but it also bars in nearly identical terms persons who have been involved in torture. The INA renders inadmissible any alien who has "committed, ordered, incited, assisted, or otherwise participated in the commission of . . . any act of torture." *Id.* § 212(a)(3)(E)(iii)(I), 8 U.S.C. § 1182(a)(3)(E)(iii)(I). It would be difficult to find a principled ground to distinguish the torture ground of inadmissibility as an absolute prohibition, while interpreting the same language of "ordered, incited, assisted, or otherwise participated in" elsewhere in the INA to allow an exception for duress when it comes to persecution. The potential extension of the Board's reasoning is far from hypothetical; the Ninth Circuit remanded a matter to the Board to decide whether there is a duress exception to the torture ground of inadmissibility. *See Perez-Rojas v. Sessions*, 685 F. App'x 575, 577–78 (9th Cir. 2017).

Making admissible those torturers who claim to have been coerced would be just the beginning. The INA also renders inadmissible those who have "ordered, incited, assisted, or otherwise participated in genocide." *Id.* § 212(a)(3)(E)(ii), 8 U.S.C. § 1182(a)(3)(E)(ii). This prohibition, too, runs parallel to the persecutor bar. As does one for extrajudicial killing. *See id.* § 212(a)(3)(E)(iii)(II), 8 U.S.C. § 1182(a)(3)(E)(iii)(II) (rendering inadmissible any person who, under color of law of any foreign country, has "committed, ordered, incited, assisted, or otherwise participated in the commission of . . . any extrajudicial killing"). Once those doors are opened, one might reasonably question why an exception for duress or coercion would not also apply to those who assist in alien smuggling, *id.* §§ 212(a)(6)(E)(i), 237(a)(1)(E), 8 U.S.C. §§ 1182(a)(6)(E)(i), 1227(a)(1)(E), or controlled-substance trafficking, *id.* § 212(a)(2)(C), 8 U.S.C. § 1182(a)(2)(C). Congress could have specified exceptions to one or more of these bars, but it did not, and I believe it should be the policy of the Department not to infer such exceptions to the INA.

Second, inferring a duress exception to the persecutor bar and related bars would impose significant additional costs on the immigration system, especially in those cases where DHS attempts to verify or counter claims of duress. Unlike in domestic criminal cases, immigration judges and DHS

"already face the overwhelming task of attempting to recreate, by a limited number of witnesses speaking through (often poor-quality) translation, events that took place years ago in foreign, usually impoverished countries." *Negusie*, 555 U.S. at 527 (Scalia, J., joined by Alito, J., concurring); *see Dia v. Ashcroft*, 353 F. 3d 228, 261–62 (3d Cir. 2003) (en banc) (Alito, J., joined by Sloviter & Roth, JJ., concurring in part and dissenting in part). DHS explains that it has "no ability, and in some cases no authority, to conduct human rights-related investigations in countries where active conflict is occurring or with which the United States has limited or non-existent diplomatic relations." DHS's Br. 7; *see Angov v. Lynch*, 788 F.3d 893, 901 (9th Cir. 2015) ("There's very little the United States can do to investigate obscure incidents that allegedly occurred in countries on the other side of the globe. Even if it were economically feasible, we can't send the FBI into a foreign country to conduct a full field investigation. The best we can do is to have consular personnel check basic facts, in addition to the many other functions they perform. And we have very few U.S. consular personnel on the ground in most countries[.]").

As this matter readily demonstrates, such investigations would be further complicated when a foreign government is allegedly responsible for the acts of coercion. And DHS's ability to seek information—especially information pertaining to individual applicants for asylum—is limited because disclosing the applicant's identity is prohibited by regulation in many circumstances and can itself provide grounds for asylum or withholding of removal by exposing the applicant to future harm. *See* 8 C.F.R. §§ 208.6, 1208.6; *Dayo v. Holder*, 687 F.3d 653, 657 (5th Cir. 2012) ("[W]e join the Second and Fourth Circuits in concluding that although a breach of confidentiality caused by violating 8 C.F.R. § 208.6 does not always require vacating the order of removal, the applicant must be permitted to use the breach for a new claim for asylum, withholding of removal, and relief under the CAT."). Creating an exception for duress or coercion would only increase this significant burden and "increase the already inherently high risk of error" in immigration proceedings. *Negusie*, 555 U.S. at 527 (Scalia, J., joined by Alito, J., concurring). An increased risk of erroneously awarding relief or protection from removal is particularly unacceptable where, as here, an individual concedes that he assisted in persecuting others.

The Board dismissed these concerns by assuming that inquiries into duress or coercion would be no different from the kinds of fact-findings that immigration judges and DHS must already make in asylum proceedings. Whether or not that assumption is true, the need for additional facts is a need for additional facts. Foisting such responsibility on DHS and immigration judges will inescapably burden an already resource-depleted process and

impede the ability of non-persecutors to obtain protection or relief. Those limited resources should instead be directed towards applicants who have not persecuted others, even under duress or coercion. Such policy considerations strongly weigh against implying a duress exception to the persecutor bar.

In reaching this conclusion, I do not minimize the respondent's experience or that of other aliens who have escaped from severe circumstances in their home countries. As DHS acknowledges, "[s]ome of these applicants have endured unimaginable harm themselves, and . . . precluding a duress exception to the persecutor bar might limit some of the forms of immigration relief and protection available to aliens, though not all." DHS's Br. 29. Even when the persecutor bar forecloses certain forms of protection or relief, an alien may still obtain deferral of removal under the CAT—as the respondent himself did in this matter. The absence of a duress exception thus does not mean that an alien who assisted in persecution under duress will necessarily lack protection. The respondent's complaint is therefore not that he failed to obtain any form of protection or relief, but only that he did not obtain all the immigration benefits for which he would otherwise be eligible.

## III.

In the course of its opinion, the Board also addressed the burdens of proof associated with application of the persecutor bar. The Board concluded that "the initial burden is on the DHS to show evidence that indicates the alien assisted or otherwise participated in persecution." *Negusie*, 27 I&N Dec. at 366. In the Board's view, only after DHS meets that burden and presents sufficient prima facie evidence of persecutory conduct will the burden shift to the applicant "to show by a preponderance of the evidence that the persecutor bar does not apply either because he did not engage in persecution or because he acted under duress." *Id.* I address the burden of proof because the Board and the courts of appeals have been inconsistent on this issue.[26]

---

[26] *Compare, e.g.*, *Castañeda-Castillo v. Gonzales*, 488 F.3d 17, 21 (1st Cir. 2007) (en banc) ("[O]nce the government introduced evidence of the applicant's association with persecution, it then became *Castañeda*'s burden to disprove that he was engaged in persecution."), *and Gao v. Att'y Gen.*, 500 F.3d 93, 103 (2d Cir. 2007) ("[O]nce the government has satisfied its initial burden of demonstrating that the persecutor bar applies, the burden would then shift to the applicant[.]"), *and Matter of S-K-*, 23 I&N Dec. 936, 939 (BIA 2006) ("[DHS] satisfied its burden of establishing that the evidence 'indicated' that an asylum bar applied, and under the regulation the burden of proof has shifted to the respondent to show by a preponderance of the evidence that the bar is inapplicable."), *and*

The INA generally requires an alien applying for relief or protection from removal to demonstrate eligibility for the relief or protection sought. *See id.* § 240(c)(4)(A), 8 U.S.C. § 1229a(c)(4)(A). Similarly, INA § 208(b)(1)(B), 8 U.S.C. § 1158(b)(1)(B), provides that "[t]he burden of proof is on the applicant to establish that the applicant is a refugee" within the statutory definition, located at INA § 101(a)(42), 8 U.S.C. § 1101(a)(42), which excludes a person who has engaged in persecution on account of a protected ground. *See also* 8 C.F.R. § 1208.13(a). None of these provisions places a burden on DHS.

The burden associated with the persecutor bar is clarified at 8 C.F.R. § 1240.8(d), which provides:

> The respondent shall have the burden of establishing that he or she is eligible for any requested benefit or privilege and that it should be granted in the exercise of discretion. If the evidence indicates that one or more of the grounds for mandatory denial of the application for relief may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.

*See also id.* § 1208.16(d)(2) ("If the evidence indicates the applicability of one or more of the grounds for denial of withholding enumerated in the

---

*Matter of A-H-*, 23 I&N Dec. at 786 ("Assuming the [government] did offer sufficient prima facie evidence to indicate that respondent 'incited, assisted, or otherwise participated in' the persecution of persons in Algeria, the burden fell on respondent to disprove that he did so by a preponderance of the evidence."), *with Vasquez-Martinez v. Holder*, 564 F.3d 712, 716 (5th Cir. 2009) ("[N]either *Cisneros-Perez* nor any case in this Circuit establishes the proposition that the initial burden of production of evidence that the alien is ineligible for discretionary relief lies with the government. Such a conclusion does not flow from the language of the statute or the concomitant regulation."), *and Hernandez v. Reno*, 258 F.3d at 812 ("If there is any evidence that an applicant . . . has assisted or participated in persecution, that individual has the burden of demonstrating by a preponderance of the evidence that he has not been involved in such conduct."), *and Matter of M-B-C-*, 27 I&N Dec. 31, 37 (BIA 2017) ("[T]he relevant inquiry under 8 C.F.R. § 1240.8(d) is whether *the evidence indicates* that the grounds for mandatory denial . . . *may apply* to [the alien] so that he then has the burden to show that they do not apply. In using the terms 'indicates' and 'may apply' together, 8 C.F.R. § 1240.8(d) does not create an onerous standard and necessarily means a showing less than the preponderance of the evidence standard. . . . Accordingly, we hold that where the record contains some evidence from which a reasonable factfinder could conclude that one or more grounds for mandatory denial of the application may apply, the alien bears the burden under 8 C.F.R. § 1240.8(d) to prove by a preponderance of the evidence that such grounds do not apply."). I overrule *Matter of A-H-* to the extent it is inconsistent with this opinion and suggests DHS has a burden of production.

[INA], the applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.").

Consistent with the clear statutory mandate that an alien has the burden of proving eligibility for immigration relief or protection, the regulations make plain that if evidence in the record indicates that the persecutor bar may apply, then the applicant bears the additional burden of proving by a preponderance of the evidence that it does not. Although the evidence in the record must raise the possibility that the bar "may apply," *id.* § 1240.8(d), neither the statutory nor the regulatory scheme requires an extensive or particularized showing of the bar's potential applicability, and evidence suggesting the bar's applicability may come from either party.[27] While the immigration judge must determine whether the evidence indicates that the persecutor bar may apply—and, thus, whether the alien bears the burden of proving its inapplicability—that determination is an evidentiary one that does not stem from any burden on DHS.

This conclusion is underscored by other statutory and regulatory provisions that specify when DHS is required to assume an evidentiary burden. *See, e.g.*, INA § 240(c)(3)(A), 8 U.S.C. § 1229a(c)(3)(A) ("In the proceeding [DHS] has the burden of establishing by clear and convincing evidence that, in the case of an alien who has been admitted to the United States, the alien is deportable."); 8 C.F.R. § 1208.13(b)(1)(ii) ("In cases in which an applicant has demonstrated past persecution . . . , [DHS] shall bear the burden of establishing by a preponderance of the evidence the requirements of paragraphs (b)(1)(i)(A) or (B) of this section."); *id.* § 1208.16(b)(1)(ii) (similar) *id.* § 1240.8(a) ("A respondent charged with deportability shall be found to be removable if [DHS] proves by clear and

---

[27] In *Budiono v. Lynch*, 837 F.3d 1042, 1048 (9th Cir. 2016), the Ninth Circuit cited these regulations to "require a threshold showing of particularized evidence of the [terrorist] bar's applicability before placing on the applicant the burden to rebut it," including "threshold evidence of *each* element" of the bar. *See also Kumar v. Holder*, 728 F.3d 993, 998–1000 (9th Cir. 2013) (requiring a particularized, threshold showing of each element before considering whether the persecutor bar should apply and remanding for further fact-finding). I disagree with this interpretation because the regulations require only that the evidence indicate the possible application of a bar. This does not mean, as the Ninth Circuit feared, that an applicant must proactively identify and rebut all potential bars, *Budiono*, 837 F.3d at 1049; rather, like any other potentially contested matter, immigration judges (or DHS) can advise applicants when they believe that the evidence places the matter at issue. I agree with the Ninth Circuit that "the language of the regulations . . . assume[s] that the record will contain at least some evidence indicating that a bar applies before the applicant has the burden to disprove it," *id.*, but such language does not require the particularized inquiry or heightened threshold, including evidence of each element, suggested by *Budiono*.

convincing evidence that the respondent is deportable as charged."); *id.* § 1240.8(c) ("In the case of a respondent charged as being in the United States without being admitted or paroled, [DHS] must first establish the alienage of the respondent. Once alienage has been established, unless the respondent demonstrates by clear and convincing evidence that he or she is lawfully in the United States pursuant to a prior admission, the respondent must prove that he or she is clearly and beyond a doubt entitled to be admitted to the United States and is not inadmissible as charged."). Placing an initial burden on DHS to establish the applicability of the persecutor bar would be contrary to the relevant statutory and regulatory scheme, and would unnecessarily tax its limited resources, especially when "[t]he specific facts supporting a petitioner's asylum claim . . . are peculiarly within the petitioner's grasp." *Angov*, 788 F.3d at 901 (internal quotation marks omitted).

The Board thus erred in concluding that DHS had a prima facie burden to establish that the persecutor bar may apply.

## IV.

For the reasons stated above, I overrule the Board's conclusion that duress or coercion is relevant in determining whether an alien who assisted or otherwise participated in persecution is prevented by the persecutor bar from establishing eligibility for asylum and withholding of removal under the INA, or withholding of removal under the CAT, that the initial burden is on DHS to show evidence indicating the persecutor bar applies, and all other Board precedent inconsistent with this opinion. I vacate the Board's decision and remand this matter to the Board with instructions to place the case on hold pursuant to 8 C.F.R. § 1003.1(d)(6)(ii)(B) pending the completion or updating of all identity, law enforcement, or security investigations or examinations. Once those investigations or examinations are complete, the Board should enter an appropriate order.